THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RUSSELL SMREKAR, Defendant-Appellant.

Fourth District   No. 4—88—0594

Opinion filed January 11, 1990.—Rehearing denied February 23, 1990.

Daniel D. Yuhas and David Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of Springfield, for the People.

JUSTICE LUND delivered the opinion of the court:

On July 15, 1988, the circuit court of Logan County, pursuant to the State's motion, dismissed the petition of defendant Russell Smrekar filed pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1987, ch. 38, pars. 122—1 through 122—8). Defendant appeals. We affirm.

On February 28, 1977, defendant was found guilty by a jury of committing two acts of murder. He was subsequently sentenced to 100 to 300 years for each offense with said sentences to run consecutively. This court affirmed the convictions and sentences in *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848, finding overwhelming proof of defendant's guilt.

Originally, in 1980 defendant filed a *pro se* petition for post-conviction relief which was eventually withdrawn without prejudice. A new petition was filed in 1987. Counsel was appointed and an amended petition was filed. The State filed a motion to dismiss which the court granted.

Defendant now raises two issues on appeal. The first is that the court improperly dismissed his allegation in his post-conviction petition that he received ineffective assistance of counsel. The second is that the recent Illinois Supreme Court case, *People v. Zayas* (1989), 131 Ill. 2d 284, 546 N.E.2d 513, which held that post-hypnotic evidence is inadmissible, requires reversal of this case.

While the underlying facts of this case are adequately set out in *Smrekar*, a brief review of them here will facilitate the present analysis.

On October 9, 1976, in Lincoln, Illinois, Ann Mardis observed her brother and sister-in-law return to their next-door trailer. Around 1 a.m. she heard a "roaring" noise come from her brother's trailer. She looked out the window and observed a man standing next to the trailer who, acting as if he forgot something, turned around and entered the trailer. She attempted to telephone her brother and received no answer. When she returned to the window the man was gone. She observed him 30 to 40 seconds, and the area between the residences is very well lit. She went to the trailer and found her brother and sister-in-law shotgunned to death.

About 3:30 a.m. on that day defendant was stopped and ticketed on what was then U.S. Route 66 (now Interstate 55) south of Odell traveling 96 miles per hour. He was heading north toward Joliet. Route 66 was a direct route between Lincoln and Joliet, where defendant lived at that time.

The next day Mardis told the police she had a 50-50 chance of

identifying the man she saw. She was shown some pictures. She picked out two as being possible. One she selected due to the hair length. The other she selected because the facial features looked right, but the hair was wrong. This was the picture of defendant.

She subsequently visited a physician who hypnotized her to enhance her memory. On October 18 she saw defendant in person for the first time and immediately identified him. Defendant was in a crowd of people at that time. She also identified him at trial.

The State's evidence also established that defendant had been earlier charged with misdemeanor theft and that one of the murder victims and Ruth Martin were prosecution witnesses. That trial had been set for October 19, 1976. In June 1976, Martin disappeared and has not been found. Bloodstains were found in her garage, and her car was found in Bloomington with bloodstains in the trunk.

Two youths told the police that approximately three to four hours before the crime they observed a man driving his car slowly with the headlights off and acting suspiciously upon exiting it in the crime area. They could not see the person's face, but, in a lineup, picked two people out as resembling the person in height and build. Again, one was defendant.

Defendant, upon his arrest, was held at the Macon County jail. While being booked he was told the charges were serious. The booking deputy testified defendant stated, under his breath, that he did it but the State would never prove it.

Finally, the State presented the testimony of two cellmates of defendant whom we referred to in *Smrekar* as Witness I and Witness II. Witness I testified defendant told him he killed the victims and Martin to keep them from testifying against him. Defendant also related some aspects of the shooting to Witness I which were corroborated by the medical testimony. Witness II testified similarly and in much greater detail. However, in *Smrekar*, defendant raised allegations of discovery errors concerning this witness and we indicated we would not consider this evidence then (*Smrekar*, 68 Ill. App. 3d at 390, 385 N.E.2d at 856), and we will not now.

Defendant raised an alibi defense. As we observed earlier, the testimony of defendant's mother, father, cousin, and girlfriend was inconsistent and impeached by their biased and inconsistent statements. (*Smrekar*, 68 Ill. App. 3d at 384, 385 N.E.2d at 852.) Defendant's testimony was inconsistent with some of theirs. His explanation for being south of Odell heading toward Joliet at 3 a.m. was highly implausible in and of itself. This implausibility was increased by conflicts between his testimony and that of the arresting officer concerning

defendant's statements at the traffic stop.

After reviewing all the relevant evidence, this court in *Smrekar* commented on the weight of that evidence as follows:

"The most that the withheld information could have accomplished was to completely nullify the probative value of the testimony of Witness II. Even without that testimony the totality of (1) the testimony of the confessions and admissions of the defendant to Witness I and Deputy McCammon, (2) the circumstances of defendant's speeding arrest at Odell at a time when he would likely have been fleeing from the crime, (3) his motive to kill, and (4) the mysterious disappearance of Ruth Martin accompanied by evidence of his confession of killing her, together with whatever weight the jury might have given to the identification testimony of Ann Mardis, and all in the face of defendant's unlikely and highly impeached alibi evidence, would present a picture of overwhelming proof of guilt." *Smrekar*, 68 Ill. App. 3d at 390, 385 N.E.2d at 856.

In his post-conviction petition, defendant asserted he received ineffective assistance of counsel. He specifically argued that counsel should have procured an expert witness to testify to the shortcomings of hypnotically enhanced evidence. An affidavit of a psychiatry professor was attached. This affidavit stated it was the witness' professional opinion, after reviewing the testimony concerning the hypnotic procedure, that "there is an above average probability that seeing a photograph of the defendant prior to hypnosis and then undergoing hypnosis may have strongly influenced the witness' belief that defendant was the man she had seen." The court, determining that an expert cannot testify as quoted, granted the State's motion to dismiss the petition.

■ The Post-Conviction Hearing Act provides a remedy to criminal defendants who claim that substantial violations of constitutional rights occurred in their trial. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365, 507 N.E.2d 830, 833, *cert. denied* (1987), 484 U.S. 873, 98 L. Ed. 2d 163, 108 S. Ct. 212.) Such a proceeding is not an appeal *per se*, but a collateral attack upon a final judgment. (*People v. James* (1986), 111 Ill. 2d 283, 290, 489 N.E.2d 1350, 1353.) The scope of review is limited to issues which have not been, and could not have been, previously adjudicated. *People v. Owens* (1989), 129 Ill. 2d 303, 308, 544 N.E.2d 276, 277; *People v. Gaines* (1984), 105 Ill. 2d 79, 87-88, 473 N.E.2d 868, 873.

■ ■ Generally, the issue of a trial counsel's competence is waived where the defendant's appellate counsel fails to raise it on di-

rect appeal. (*Owens*, 129 Ill. 2d at 308, 544 N.E.2d at 277; *Gaines*, 105 Ill. 2d at 91, 473 N.E.2d at 875.) However, the waiver rule is relaxed where the facts relating to the issue of incompetency do not appear on the face of the record (*Owens*, 129 Ill. 2d at 308, 544 N.E.2d at 277), or in the situation where the same attorney represents defendant at trial and on appeal. (See *Gaines*, 105 Ill. 2d at 91, 473 N.E.2d at 875.) In the present case defendant was represented by different counsel on appeal. While appellate counsel's brief did not specifically raise the issue of trial counsel's ineffectiveness, it did address what is referred to as trial counsel's inactivity in his failure to preserve alleged errors. It is apparent then that this present allegation could have been raised and addressed on direct appeal, and defendant is therefore barred from raising this issue in his post-conviction petition.

■ However, even if we address defendant's contention, the trial court's ruling must stand. The United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, formulated a two-part test for evaluating whether a claim of ineffective assistance of counsel rises to the level of a constitutional deprivation. Defendant must first demonstrate that counsel's performance was deficient. (*Owens*, 129 Ill. 2d at 309, 544 N.E.2d at 278.) Defendant must also prove that his counsel's deficient performance substantially prejudiced his defense. (*Owens*, 129 Ill. 2d at 309, 544 N.E.2d at 278.) To meet this second test, a defendant must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) It is upon this second prong that defendant's case fails.

■ The purpose of the missing expert testimony is to discredit the positive identification of defendant by Mardis on October 18 and in court. However, even if we assume that these identifications were totally discredited, that still leaves her selection of defendant's picture as one of two possibilities prior to her hypnosis. She selected defendant's picture because it closely resembled the facial features of the man she saw. Her only reservations involved the length of the hair in the picture. As noted, in *Smrekar* this court found the evidence of defendant's guilt overwhelming. (*Smrekar*, 68 Ill. App. 3d at 390, 385 N.E.2d at 856.) In reaching that conclusion we relied on all of the evidence and did not place great weight on Mardis' post-hypnotic identification. We find that eliminating that identification, and limiting Mardis' testimony to selection of the suspect pictures, when coupled with all the other evidence, does not affect in any great way the substanti-

ality of the State's case or suggest any reasonable probability that the outcome of defendant's trial would have been different if the expert testimony had been offered. Accordingly, we find the court's dismissal of defendant's post-conviction petition was proper.

Next, defendant argues the recent supreme court case of *People v. Zayas* (1989), 131 Ill. 2d 284, 546 N.E.2d 513, in which the court held that all post-hypnotic evidence was inadmissible, requires his conviction be reversed. The specific language of *Zayas* resolves this argument. The court stated:

> "We understand that other criminal cases in Illinois have involved the use of hypnosis. This ruling, however, will not affect those cases that have been finally determined on direct appeal." (*Zayas*, 131 Ill. 2d at 298, 546 N.E.2d at 519.)

Defendant has previously exhausted his direct appeals. This present case is considered collateral (see *James*, 111 Ill. 2d at 290, 489 N.E.2d at 1353) and is thus not affected by *Zayas*.

Defendant asserts, at oral argument, that the *Zayas* court was not required to consider the effect post-hypnotic testimony has on the sixth amendment right to confrontation. He believes Mardis' post-hypnotic testimony is violative of this right and this, coupled with the *Zayas* analysis, requires reversal.

■ However, even if we assume, *arguendo*, that *Zayas* applies and that Mardis' questioned testimony violated defendant's right to confrontation, no reversible error exists. The reason the court reversed in *Zayas* is that it found that without this improper evidence the jury could have reached a different verdict. (*Zayas*, 131 Ill. 2d at 298, 546 N.E.2d at 519.) There is no such difficulty with the present case. As earlier discussed, even if we disregard Mardis' testimony concerning events during and after her hypnotism, which is the foundation of the alleged errors, and consider only the evidence we relied on in *Smrekar*, the evidence of defendant's guilt is still overwhelming. Accordingly, since a different result would not occur even if defendant's allegations of error were correct, any error is harmless. See *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, 350.

Affirmed.

KNECHT, P.J., and GREEN, J., concur.