KATHARINA TARDI, Plaintiff-Appellee, v. HARVEY HENRY, Defendant-Appellant.

First District (6th Division)   Nos. 1—90—0421, 1—90—0600 cons.

Opinion filed April 19, 1991.

1028

Lord, Bissell & Brook, of Chicago (William P. Dorr, Diane I. Jennings, and Hugh C. Griffin, of counsel), for appellant.

Stellato & Schumacher, Ltd., of Chicago (Esther Joy Schwartz, of counsel), for appellee.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

The subject of this appeal is a civil action for assault and battery filed by plaintiff Katharina Tardi against defendant Harvey Henry alleging incidents of sexual contact without her consent in 1979, 1982 and 1983. Following a trial, the jury rendered a special finding that plaintiff was not under a legal disability during the two years following the 1979 occurrence. As a result of this finding, the trial court dismissed this claim as barred by the statute of limitations. The jury then rendered a verdict in plaintiff's favor for the sexual incidents in 1982 and 1983 and awarded plaintiff $352,500 in damages. The trial court subsequently granted defendant's motion for a remittitur and reduced the damage award to $220,000. The issues on appeal are: (1) whether the evidence, viewed most favorably for the plaintiff, failed to sustain plaintiff's claims that she had been sexually assaulted by defendant; (2) whether plaintiff failed to present any evidentiary basis upon which the jury could apportion the claimed damages between the dismissed rape claim and the claims that were submitted to the jury; (3) whether defendant was denied a fair trial by the numerous trial errors that were committed; and (4) whether defendant is entitled to further reduction of the amount of damages awarded to plaintiff. Plaintiff has also filed a cross-appeal on the jury's special finding that she was not under legal disability during the time period when the

1979 rape claim should have been filed as well as the trial court's dismissal of her claim.

During the relevant time period defendant was a physician specializing in neurosurgery. In 1979 plaintiff's family physician contacted defendant for consultation and treatment regarding plaintiff's complaint of severe headaches. He was again contacted by plaintiff's physician in 1982 to treat her fainting spells and in 1983 for the treatment of her back pain. In addition to her physical complaints, plaintiff had a history of mental illness. During therapy sessions with a psychologist in 1983 and 1984, plaintiff claimed that defendant had raped her in March 1979, and that he had touched her in a sexually provocative manner on four other occasions in April 1982 and August 1983.

Plaintiff, who was 38 years of age at the time of the trial, had been diagnosed as suffering from a mental illness identified as borderline personality disorder. According to the testimony of the parties' medical witnesses, this disorder is characterized by intense emotional changes, psychotic episodes, delusions, perverse fantasies as well as behavior that is impulsive, manipulative, aggressive and controlling. People with this illness tend to have strong negative or positive feelings toward others. The illness is difficult to treat because the person affected has a great deal of difficulty forming a therapeutic relationship.

Dr. Robert Allan Reff, one of plaintiff's treating physicians, testified that plaintiff first began psychiatric treatment in 1974, although her psychological problems developed years earlier and were most likely due to early childhood abuse. Reff further testified that plaintiff dealt with her feelings regarding this childhood abuse by seeking out others to abuse, particularly those connected with the treatment of her psychological illness. On cross-examination, Reff related an incident from the record of plaintiff's psychiatric hospitalization at Northwestern Memorial Hospital in 1986. Plaintiff yelled "rape" when a mental health worker placed his hand on her shoulder to escort her back to the psychiatric unit. There was also a notation from that hospitalization that plaintiff equated the control she perceived that her psychiatrist had over her life with rape. Although Reff corroborated plaintiff's testimony that she was less depressed and functioning well during the three-year period prior to the alleged March 1979 rape, Reff acknowledged on cross-examination that there were fluctuations in plaintiff's psychological state and level of functioning during this period. The medical record for this period shows that plaintiff was prescribed diet pills, antidepressants, tranquilizers, sedatives and lithium carbonate to control her mood swings. In June 1977, plaintiff

threatened suicide, and she continued to hallucinate and exhibit symptoms of severe depression. There is also a notation in the record that plaintiff stole sleeping pills from a patient who was admitted to the hospital where plaintiff worked, and that she was refusing to take medication prescribed for her because she was afraid she would use it to kill herself.

In March 1979, plaintiff contacted her family physician complaining of headaches and a pressure in her head which at times resulted in a hearing loss. Plaintiff's physician admitted her to the hospital for a diagnostic evaluation and asked defendant to examine her. As part of his examination of the plaintiff, defendant ordered skull X rays, a CAT scan and an EEG, and he performed a lumbar puncture. The only abnormal finding was in the EEG, which showed some evidence of an underlying seizure disorder. Defendant testified that about one week after plaintiff was discharged from the hospital she telephoned him and asked him to come to her house and discuss the EEG findings with her. Defendant stated that it was not his usual practice to make house calls, but that he did so in this case because plaintiff was a nurse. He also testified that he had done so on other occasions when the patient was a medical practitioner. Defendant stated that he discussed the EEG results with the plaintiff as well as other matters for a short period of time, and that he did not examine her. He denied making any sexual advances. Plaintiff, however, testified that she did not contact defendant, and that he came to her house unannounced. Shortly after his arrival, he led her into the bedroom and raped her. Plaintiff stated that she did not tell anyone about the incident or report it to the police because defendant threatened to have her fired from her job if she did.

In 1980, plaintiff began outpatient psychiatric treatment with David Madsen, a psychologist. Madsen initially asked plaintiff if she had ever been raped, which she denied. However, in August 1983, plaintiff told Madsen that defendant had raped her, but that she could not talk about it. On September 22, 1983, Madsen hypnotized plaintiff, and she described the alleged incident. .

In April 1982, plaintiff was again hospitalized by her physician for a medical evaluation of the dizziness and fainting spells of which she had complained. Plaintiff's physician again asked defendant to see the plaintiff and provide a consultation regarding these complaints. According to defendant's testimony, plaintiff told him that she had fainted seven times over the preceding three days, and that she had been having memory lapses for about three months. He further testified that he examined the plaintiff and noted that she had self-in-

flicted wounds. He prepared a report of his examination and recommended a psychiatric consultation and CAT scan. Plaintiff was seen by a psychiatrist who diagnosed her as having borderline personality disorder and recommended treatment with antipsychotic and antidepressant medication. Plaintiff testified to a different version of her contact with defendant during this hospitalization. She stated that defendant came into her room and made repeated threats that she would lose her job and her nursing license if she told anyone about the March 1979 incident. Plaintiff then testified that defendant grabbed her breast as he was leaving. Plaintiff also testified that defendant came to her room on another occasion during this hospitalization and attempted to perform a lumbar puncture but was unable to complete the procedure when plaintiff became tense and started crying. Plaintiff stated that she became upset when defendant again threatened her regarding the alleged rape incident in 1979. According to plaintiff's testimony, defendant made the comment "I didn't have this much trouble getting it in when I was at your house," in reference to his difficulty with the procedure. Plaintiff further testified that following her discharge, she saw defendant at the hospital where they were both employed and that he made the comment that she should watch her step or she "wouldn't be a nurse anymore." Defendant's recollection of this incident was that he saw the plaintiff at the hospital where they were both working but that he only said "hello." Plaintiff described another occasion when she saw defendant in the work setting. She claimed that defendant was on his way to surgery, and when he saw her, he made the comment that he would love to get her on the table and take apart her brain so that she would never be able to talk to anyone again.

Plaintiff first reported the occurrence of the sexual incident described above during a hypnotic session with Dr. Madsen in October of 1983. She also testified that no nursing staff were present when defendant threatened her and that the roommate she had during this hospitalization did not speak English. Plaintiff acknowledged that she did not tell defendant not to treat her, and she did not tell her treating physician about defendant's conduct and threats.

In August 1983, plaintiff injured her back and was hospitalized at St. Anthony's Hospital. Her family physician again requested a consultation from defendant. Defendant testified that he examined the plaintiff and prepared a consultation report which contained a history and results of his examination. The plaintiff was in traction during this hospitalization. Defendant's medical finding was that plaintiff was suffering from a parispinal muscle spasm as well as decreased sensa-

tion and reflexes in her left leg and foot. Defendant's treatment recommendation was for bed rest, continued traction, medication and a CAT scan of the lumbar spine. The CAT scan revealed the presence of a herniated disc for which defendant recommended treatment with physical therapy with heat, massage and whirlpool. Plaintiff claimed that when defendant saw her during this hospitalization, he removed the covers and "began to grope her vagina." Plaintiff testified that she pleaded with defendant to stop and that she felt "scattered and falling to pieces." Plaintiff stated that the same assault was repeated the next day, but that this time she was wearing underwear. She claimed that defendant became angry, put his hand near her vagina and said, "[W]hat is this? You should've been ready for me." Plaintiff claimed that she then became hysterical, and defendant left her room. Plaintiff also testified that defendant came to her room on one other occasion during this hospitalization. She informed defendant that she was being released, and in response to this information he commented, "[O]h no you're not. I'm going to keep you here another week. I'll fix that." The next day defendant wrote a progress note that plaintiff should be kept in the hospital an additional week for physical therapy. On cross-examination, defendant stated that he recommended an additional week of hospitalization because the plaintiff was not responding to treatment. However, plaintiff's physician discharged her the next day.

Plaintiff reported these incidents during a therapy session with Dr. Madsen in March of 1984. Plaintiff also claimed that she had two roommates during this hospitalization who were present when the incidents occurred but that one roommate was Spanish and the other roommate was blind. She further stated that when defendant put his hand near her vagina she pushed it away and told him to "act professional." Plaintiff again acknowledged that she did not tell her physician about the sexual incidents.

Following her discharge from the hospital, plaintiff scheduled an appointment with defendant at his office. Defendant testified that he examined the plaintiff, recommended another week of bedrest and prescribed medication. He also contacted plaintiff's physician and informed him that if there was no improvement in plaintiff's condition by her next visit, he would recommend rehospitalization to perform a myelogram. Plaintiff scheduled an appointment for the following week but did not keep it. Plaintiff testified that she saw defendant in his office because her family physician requested it, she was in a lot of pain and she was unable to get an appointment with another specialist. Plaintiff stated that she wore a sweatshirt and jogging pants to

prevent any further attacks. However, when she arrived at defendant's office, he ordered her to get undressed but provided no gown or sheets for her to use. She also stated that there was no one else present during the examination. Plaintiff refused to remove her clothes, but defendant became angry and ordered her to get on the examining table. When plaintiff was on the examining table, defendant pulled her leg up which caused her a great deal of pain. She then testified that defendant had her stand on the floor and bend down to touch her toes. At this point, defendant approached her, put his hand near her vagina again and "groped her vagina." After this incident, plaintiff did not return to defendant's office for further treatment but began seeing another doctor for her back problem. Plaintiff further claimed that following the sexual assaults, she became very depressed and suicidal, and she was hospitalized for psychiatric treatment on 14 occasions.

On January 25, 1984, plaintiff filed a complaint against defendant alleging the 1979 rape and the sexual incidents which she claimed occurred in 1982 and 1983. Defendant denied plaintiff's allegations and raised an affirmative defense that the rape claim was barred by the statute of limitations. Plaintiff then responded that she was mentally disabled prior to January 25, 1982, and that the statute of limitations was tolled. Trial commenced on the allegations of plaintiff's complaint, defendant's affirmative defense as well as the issue of plaintiff's competency. The jury found that plaintiff was competent during the relevant time period and her rape claim was dismissed on the grounds that it was barred by the statute of limitations. A verdict was then returned in plaintiff's favor on the 1982 and 1983 sexual incidents. Defendant appealed the jury's verdict, and plaintiff filed a cross-appeal on the issue of whether she was under a legal disability during the time period when the rape claim should have been filed and whether her rape claim should have been dismissed.

■■ ■ Defendant contends that he is entitled to a judgment *n.o.v.* or a new trial where the evidence, even when viewed most favorably for the plaintiff, overwhelmingly failed to support plaintiff's claims that she was sexually assaulted by defendant. The standard used to determine whether a motion for a judgment *n.o.v.* should be granted, as set forth in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, states that the motion should only be granted "in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick,* 37 Ill. 2d at 510.) However, on a motion for a new trial, the

applicable standard is whether the verdict is against the manifest weight of the evidence. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32.) Defendant claims that plaintiff's testimony regarding the alleged sexual incidents in 1982 and 1983 was not sufficient to sustain the current verdict against him under either standard.

Plaintiff's allegations against defendant were that he grabbed her breast during a hospitalization in April and May of 1982 and "groped her vagina" during a hospitalization and office visit in August of 1983. In addition to plaintiff's trial testimony as to the occurrence of these incidents, Dr. Madsen testified on cross-examination that plaintiff reported the two hospital incidents while under hypnosis. Defendant contends that because plaintiff's testimony concerning these incidents was hypnotically induced, it was unreliable and therefore inadmissible.

The Illinois Supreme Court in *People v. Zayas* (1989), 131 Ill. 2d 284, 546 N.E.2d 513, addressed the question of whether hypnotically enhanced testimony was admissible. The court quoted the definition of "hypnosis" advanced by the American Medical Association as:

" '[A] temporary condition of altered attention in the subject which may be induced by another person and in which a variety of phenomena may appear spontaneously or in response to [verbal] or other stimuli. These phenomena include alterations in consciousness and memory, increased susceptibility to suggestion, and the production in the subject of responses and ideas unfamiliar to him in his usual state of mind.' " (*Zayas*, 131 Ill. 2d at 290, quoting *The Admissibility of Hypnotically Refreshed Testimony*, 20 Wake Forest L. Rev. 223, 224 (1984).)

The court noted:

"As this rather imprecise definition indicates, the nature of hypnosis remains largely a mystery, and can be defined only by its symptoms and manifestations. The various theories explaining hypnosis, moreover, are often in conflict and may never be fully understood. [Citation.] Because no one really understands it, hypnosis plays a rather dubious role in judicial proceedings." *Zayas*, 131 Ill. 2d at 290.

The court identified three possible approaches that could be taken regarding the admissibility of this evidence. The first approach would be one of *per se* admissibility which would place the burden on the jury to determine the witness' credibility. The rationale for this approach is that the previously hypnotized witness is subject to cross-examination, and that the opposing party can present his own expert witness to rebut the testimony of the experts that the proponents of

the evidence examined. (*Zayas*, 131 Ill. 2d at 291.) The court then addressed the ways in which this reasoning is flawed. The first problem is:

"[P]reviously hypnotized witnesses are virtually immune from effective cross-examination. That is, having been hypnotized, the subject gains complete confidence in his 'restored' memory, forgets how it was 'restored,' and is unable to differentiate between that which he was able to recall before hypnosis and that which the hypnosis elicited. Any information that the hypnotist suggested, or the subject fantasized or confabulated, becomes part of the subject's 'restored' memory \*\*\*." (*Zayas*, 131 Ill. 2d at 291.)

The other problem with this approach is the jurors' misconceptions of the hypnotic process which impair their ability to objectively weigh the credibility of the previously hypnotized witness. The court stated:

"The public has been barraged with misinformation concerning hypnosis and has resultantly been led to incorrectly believe that it provides a panacea for lost memory. [Citation.] While some studies show that, when properly administered, hypnosis can increase one's quantitative memory, these studies also demonstrate that subjects tend to fill in forgotten details with details they concoct and are later unable to discern between the two." *Zayas*, 131 Ill. 2d at 292.

The second approach which could be taken regarding the admissibility of hypnotically induced testimony would be to develop a strict set of procedural safeguards. The shortcomings of this approach, however, are that no procedural safeguards could be devised which could detect whether a hypnotist has unintentionally or subconsciously implanted suggestions in the mind of the subject. In fact, hypnosis requires that the hypnotist suggest answers to the subject. "The subject, moreover, will inevitably fill in missing details and fantasize about events that never in fact happened." (*Zayas*, 131 Ill. 2d at 292.) Furthermore, procedural safeguards do nothing to eliminate the problems associated with the bolstered witness' confidence and erroneous juror perception. *Zayas*, 131 Ill. 2d at 293.

The *Zayas* court concluded that because of the problems inherent in the first two approaches, the third approach of *per se* inadmissibility was being more frequently adopted by other jurisdictions. The court found that the standard originally applied to the inadmissibility of polygraph evidence was also applicable to hypnotically induced testimony. This standard holds that a court should not allow into evidence a "scientific" test which the relevant scientific community has

not recognized as reliable. (*Zayas*, 131 Ill. 2d at 293, citing *Contreras v. State* (Alaska 1986), 718 P.2d 129.) The *Zayas* court then concluded that not only did the relevant scientific community generally find hypnotically induced recall inaccurate but "the legal and scientific literature is now replete with articles imploring courts to reject such evidence because of its many flaws." (*Zayas*, 131 Ill. 2d at 294-95.) In conclusion, the court stated:

"[B]ecause its reliability is suspect, and is not amenable to verification due to the fact that even the experts cannot agree upon its effectiveness as a memory-restorative device, a witness' hypnotically induced testimony, other than that of the defendant, is not admissible in Illinois courts." *Zayas*, 131 Ill. 2d at 295.

■ Based upon *Zayas*, we conclude that the plaintiff's testimony as well as that of Dr. Madsen regarding what the plaintiff reported during the hypnotic sessions was also unreliable because in both instances it would be difficult to distinguish between what portion of plaintiff's recall was hypnotically enhanced, the product of the therapist's suggestion, or the plaintiff's own fantasies. Because the plaintiff would not be able to make this distinction herself, she would be immune from effective cross-examination. Additionally, there were the potential problems associated with the jurors' erroneous perceptions of hypnosis as an infallible process. Lastly, the relevant scientific community does not generally accept hypnotically induced recall as accurate or, at the very least, does not agree on the effectiveness of the hypnotic process to restore memory.

Plaintiff first argues that the reliability of the hypnotically induced testimony and statements was a credibility issue for the jury to decide. Plaintiff also claims that the admission of this evidence was proper because defendant was able to cross-examine the plaintiff and Dr. Madsen. However, pursuant to our discussion above regarding the jury's inaccurate perceptions of hypnosis as well as a hypnotic subject's immunity to cross-examination, we find both arguments without merit.

■ Plaintiff next raises several points in support of her argument that the holding in *Zayas* is inapplicable to this case. Plaintiff first claims that the holding in *Zayas* is only applicable to criminal cases where the hypnotically enhanced testimony is by an occurrence witness. However, contrary to plaintiff's contention, the only exception made by the *Zayas* court to the inadmissibility of hypnotically enhanced testimony is in the case of a criminal defendant. This exception for criminal defendants is based on the reasoning that the restric-

tion of his testimony in this manner would be a violation of his constitutional rights under the fourteenth, fifth and sixth amendments. (*Rock v. Arkansas* (1987), 483 U.S. 44, 51-53, 97 L. Ed. 2d 37, 46-47, 107 S. Ct. 2704, 2708-10.) Thus, the exception is inapplicable to this case.

■ Plaintiff further argues that defendant failed to prove that her memory of the alleged sexual incidents was hypnotically induced. One of the problems inherent in the testimony of one who has previously been hypnotized is that the subject is "unable to differentiate between that which he was able to recall before hypnosis and that which the hypnosis elicited." (*Zayas*, 131 Ill. 2d at 291.) *Zayas* also holds that it is the proponent of the prehypnotic recall who bears the burden of establishing that her testimony was based solely on independent prehypnotic recall. *Zayas*, 131 Ill. 2d at 297.

Plaintiff's final argument is that defendant has waived this issue on appeal because he failed to make a trial objection to plaintiff's or Dr. Madsen's testimony regarding plaintiff's hypnotically enhanced recall. Defendant claims that the waiver rule is inapplicable because at the time of the trial in this matter, hypnotically induced testimony was admissible subject to certain procedural safeguards. (See *People v. Jordan* (1983), 120 Ill. App. 3d 836, 458 N.E.2d 1115; *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848.) One month following the trial, the Illinois Supreme Court issued the *Zayas* opinion, which held that hypnotically induced testimony, except in the case of a criminal defendant, was *per se* inadmissible. Defendant subsequently included an objection to the admission of plaintiff's hypnotically induced testimony in his motion for a new trial.

■ Where there has been a change in law due to a judicial decision or statutory alteration, after a case has been adjudicated and remains pending in the trial court or on direct appeal, the waiver rule is inapplicable. (*People v. Fernetti* (1984), 104 Ill. 2d 19, 21-22, 470 N.E.2d 501.) Although plaintiff argues that there was no change in the law regarding this case because the *Zayas* holding is only applicable to criminal cases, we do not interpret *Zayas* to limit its ruling in this way. As we previously stated, the only exception we find in *Zayas* is for criminal defendants based on constitutional protections specific to them. Furthermore, even if defendant had misinterpreted the applicability of the *Zayas* ruling to this case, the law in Illinois regarding this issue was sufficiently altered by *Zayas* to justify defendant's failure to object until the opinion was issued. Thus, plaintiff's waiver argument is also without merit.

■ For the aforementioned reasons, we conclude that plaintiff's hypnotically induced testimony and statements to Dr. Madsen regarding defendant's alleged sexual conduct were *per se* inadmissible. Having concluded that the plaintiff's hypnotically enhanced testimony and statements to Dr. Madsen were inadmissible, we next address the question of which portion of this evidence was hypnotically induced.

■ On direct examination, Dr. Madsen was asked if the plaintiff related more than one instance with Dr. Henry. Dr. Madsen replied that she had, that it was in October 1983, while plaintiff was in a hypnotic state. Although it appears from Dr. Madsen's recitation of his notes that plaintiff talked about experiences with the defendant during the 1982 hospitalization, there is no specific reference to the sexual incident which was alleged to have occurred at that time. He then testified that the sexual incident which allegedly occurred during the 1983 hospitalization was related by the plaintiff in a "straight-forward discussion." However, on cross-examination, Dr. Madsen stated that all of the alleged hospital assaults were reported by the plaintiff while under hypnosis. Plaintiff's statements regarding what was hypnotically induced are also contradictory. Although plaintiff claimed during oral argument that none of the alleged sexual incidents were hypnotically induced, plaintiff stated in her appellee's brief:

"A good deal of plaintiff's history, including her sexual encounters with Dr. Henry, was told to Dr. Madsen under hypnosis."

"Plaintiff herself detailed how the defendant sexually assaulted her, and explained how she remembered these incidents while under hypnosis administered by Dr. Madsen."

Therefore, while we recognize that the evidence as to what was hypnotically induced is ambiguous, *Zayas* teaches us that plaintiff's testimony was inherently unreliable. Thus, even if admissible, it would be of very little value. Further, plaintiff's uncorroborated testimony was all that was offered in support of her claim.

■ There were also additional factors which contributed to the unreliability of the evidence against defendant. The testimony of plaintiff's treating physician and psychologist established that she had been suffering from borderline personality disorder for many years which was characterized by periodic hallucinations and delusions, difficulty with male relationships and "hate feelings" toward others. The evidence also established that plaintiff had been inconsistent in relating past sexual experiences. At times she claimed that she had been sexually molested as a child but was unable to give any information about these alleged incidents. At other times plaintiff denied such oc-

currences. In addition, when the plaintiff first began therapy with Dr. Madsen in 1980 she denied that she had ever been raped, but in September 1983, plaintiff told Dr. Madsen that she had been raped by defendant in 1979. There was also evidence that plaintiff had identified sexual conduct where none had occurred, such as when a staff member placed his hand on plaintiff's shoulder during one of her psychiatric hospitalizations and she screamed "rape."

Another factor contributing to the unreliability of plaintiff's allegations was her failure to report the incidents to anyone at the time that they occurred. Not only was there a four-year delay in reporting the rape incident, but the 1982 incident was not communicated to anyone including her therapist for 1½ years, and the 1983 incident was not reported until six months after its occurrence. Furthermore, although defendant allegedly threatened plaintiff if she reported the rape incident, there was no apparent reason why plaintiff could not have sought treatment from another neurosurgeon at any time between 1979 and 1983. Finally, plaintiff offered the testimony of her sister to corroborate her own testimony regarding the sexual incidents. However, plaintiff's witness contradicted plaintiff's testimony when she stated that in 1983, plaintiff told her about an incident of defendant touching plaintiff's breast which had just occurred. Plaintiff testified that this incident took place in 1982.

As a result of the foregoing, we conclude that the evidence, even when viewed in a light most favorable to the plaintiff, so overwhelmingly favors defendant that no contrary verdict could stand. (See *Pedrick*, 37 Ill. 2d at 510.) Therefore, we need not address defendant's other issues.

### CROSS APPEAL

Plaintiff appeals the special finding of the jury that she was not under a legal disability during the period when she could have timely pursued her rape claim. The question of plaintiff's legal disability was tried along with her suit against Dr. Henry for rape and sexual assault. Following the presentation of evidence on all of these issues, a special interrogatory was submitted to the jury which stated:

"Was Katharina Tardi from the period of time beginning on March 29, 1979, up to and including January 25, 1982, under legal disability."

The trial judge then defined "legal disability" for the jury as follows:

"For the purposes of this question, the term under legal disability means that during the period in question Katharina Tardi was incapable of managing her person or property and

could not comprehend her rights or the nature of the act giving rise to her cause of action."

The jury determined that during the relevant time period plaintiff was not under a legal disability and that the statute of limitations was not tolled. An order was subsequently entered dismissing plaintiff's rape claim as being time barred. Plaintiff contends that this instruction on the definition of legal disability was reversible error because it was inconsistent and contradictory, and that plaintiff should be granted a new trial on the rape claim. Plaintiff claims that the above instruction was defective because the jury was given two distinct standards by which to measure plaintiff's disability. One standard was the ability to manage her person or property, and the other standard was the ability to comprehend her rights or the nature of the act giving rise to her cause of action. Plaintiff further argues that the jury should only have been instructed on the standard of plaintiff's ability to comprehend her rights or the nature of the act giving rise to her cause of action because whether plaintiff could manage her person or property was unrelated to the kind of disability she alleged. Plaintiff further contends that, applying the proper definition of legal disability to the facts of this case, a determination should be made that plaintiff was under a legal disability during the relevant time period as a matter of law.

■■■ Without addressing the merits of plaintiff's contentions, we conclude that plaintiff is not entitled to a new trial on the merits of her rape claim. At the previous trial, plaintiff's rape claim was not dismissed until after all of the evidence had been presented. Based on our foregoing discussion, we have already concluded that the evidence presented by plaintiff was unreliable and insufficient to support a verdict in her favor. Therefore, we conclude that plaintiff's request for a new trial on her rape claim is without merit.

Accordingly, the judgment of the circuit court on direct appeal is reversed. The judgment on plaintiff's cross-appeal is affirmed.

Judgment reversed in part and affirmed in part.

EGAN and LaPORTA, JJ., concur.