Joseph Lee ROWLAND, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 94–SC–387–DG.

Supreme Court of Kentucky.

July 6, 1995.

Richard Meena, Jr., Louisville, for appellant.

Chris Gorman, Atty. Gen., Michael L. Harned, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

Following the introduction of proof by the Commonwealth, the appellant withdrew his plea of not guilty to two counts of first-degree assault and entered a conditional "*Alford*" plea of guilty under RCr 8.09 to reduced charges of second-degree assault. Since the appellant was then only seventeen years of age, the trial court sentenced him as a youthful offender pursuant to KRS 640.030, and pursuant to the plea agreement, to two ten-year terms of imprisonment, to run concurrently. The Court of Appeals affirmed on his appeal as a matter of right. We granted review and also affirm the conviction and sentence.

Carol and Daniel Rowland were married in 1987. Carol had four children by a previous marriage and Daniel had two sons, including the appellant, Joseph Lee Rowland. On January 29, 1991, Carol and Daniel and the six

children were all living together in Grant County. Daniel left for work early, and Carol began getting the children, who ranged from sixteen years old down to five years old, ready for school. When it was discovered that the batteries were missing from a computer game, Carol told her daughter Kathy Schardine, age thirteen, that her step-son Joe, age fifteen (the appellant), probably took them as "he is the biggest thief in the house." Joe had previously been the cause of problems because of his stealing.

In a short time, while several of the children had begun getting in the family car to be driven to school, Carol looked around for Joe, but couldn't find him. While she was standing on the porch, Carol heard a gunshot and felt pain in her back. As a second shot struck her, she turned and saw Joe standing at the edge of the house with a .38 pistol in his hand. As Kathy ran to her mother, the appellant fired a third shot, which struck Kathy in the back. Carol yelled at the kids, who by now were screaming, crying, and running into the house, to call the state police. In time an ambulance arrived and took Carol to the hospital. While there, she told her husband that she thought his son Joe had shot her and that two of the other children witnessed Joe's shooting of her and Kathy.

As a result of her wounds, Carol suffered permanent paralysis in her right side and was caused to walk with a limp. She also experienced considerable depression, causing her physician to refer her in April 1991 to a psychiatrist, Dr. Bruce A. Snider. Dr. Snider diagnosed Carol as having post-traumatic stress disorder and secondary depression. In his deposition, Dr. Snider described the stress disorder as a type of anxiety resulting from an overwhelming psychological or physical trauma. It is characterized by re-experiencing the traumatic event and avoiding situations which remind the patient of the event. One of the symptoms is the inability to recall certain aspects surrounding the traumatic event.

Dr. Snider prescribed medication for the depression and anxiety and also referred Carol to Dr. William Wester, a psychologist, in September of 1991. Dr. Wester agreed with Dr. Snider's diagnosis of post-traumatic stress disorder and secondary depression, and decided to treat her with hypnosis. Before beginning the hypnosis treatment, Dr. Wester took complete statements from Carol about the shooting incident. The first statement was taken on September 30, 1991, and was audiotaped, and the second statement was taken on October 16, 1991, and was videotaped. Following the videotaping, Dr. Wester, on the latter date, put Carol under hypnosis. In her statement given under hypnosis, Carol's description of the events leading up to the shooting showed "very little difference" from her pre-hypnosis description. Dr. Wester described her statement given under hypnosis as "basically, just more fine-tuned." He felt the hypnosis was helpful.

Following his indictment on two counts of first-degree assault of Carol and Kathy, the appellant requested and was granted the retention of an expert on hypnosis to assist him in the case. A defense motion was also filed for the trial court to suppress any testimony by Carol Rowland, on the basis that it had been "hypnotically refreshed." The trial court held a hearing at which both Dr. Wester and the defense expert, Dr. Paschal Baute, testified. The trial judge, Hon. Charles F. Satterwhite, denied the suppression motion but ruled that the Commonwealth would be precluded from informing the jury that Carol had been placed under hypnosis. Further, he gave the defense leave to cross-examine her on this point, and ruled that, if the defense did so, then the Commonwealth would be allowed to introduce additional testimony to explain hypnosis. Complete findings were made and entered by the trial court following this suppression hearing.

Following Carol Rowland's direct examination, the appellant moved to withdraw his plea of not guilty and to enter a conditional plea of guilty under the procedure outlined in RCr 8.09 and in *North Carolina v. Alford*, 394 U.S. 956, 89 S.Ct. 1306, 22 L.Ed.2d 558 (1969). The trial court granted the motion and accepted the appellant's guilty plea to two reduced charges of second-degree assault and fixed punishment pursuant to the

plea agreement at ten years' imprisonment on each count, to run concurrently. Sentencing in accordance therewith followed.

■ In the Court of Appeals and now in this Court, the appellant argues that the trial court erred in refusing to suppress the testimony of one of the victims, Carol Rowland, because she had previously undergone hypnosis regarding the circumstances surrounding the shooting of her and her daughter. We are asked to adopt a rule that such testimony should be inadmissible *per se*. Although some states have adopted such a rule, others take the opposite position and admit all such testimony, leaving it to the jury to judge its credibility. (Referred to as the "admissible *per se* doctrine.") Still a third group of jurisdictions has adopted what is referred to as the "safeguards approach," whereby post-hypnosis testimony is held admissible if certain safeguards are employed before and during any such hypnosis.

In its very thorough opinion herein, the Court of Appeals discussed the *Frye*[1] test for the admission of scientific evidence; the effect of the adoption of Rule 702 of the Federal Rules of Evidence and the Kentucky counterpart, KRE 702; and the recent United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). After so doing, the Court concluded that it would be inappropriate to adopt a *per se* rule excluding hypnotically refreshed testimony in light of *Daubert* and the adoption of the Kentucky Rules of Evidence. The case at hand was tried before the adoption of the Kentucky Rules of Evidence, however, at a time when the *Frye* test would otherwise have been applicable. The Court of Appeals nevertheless observed that it was not necessary even to apply the *Frye* test in this case. The opinion states:

> Many courts—including those that have held hypnotically enhanced testimony inadmissible—have ruled that a witness may testify as to matters demonstrably recalled

and related by the witness before he or she was hypnotized. In doing so, they have generally required as a prerequisite to the admission of the testimony that the witness' prehypnotic recollections have been recorded in written or taped form so that the extent and particulars of such recall may be established.

. . . . .

In the case before us, the trial court conducted an extended inquiry into the circumstances surrounding the hypnosis of Carol Rowland. The court had before it, as do we, the tapes of Carol's statements made before she was hypnotized and while hypnotized, as well as the testimony of two expert and two lay witnesses. The court made findings as to each of the matters referred to in the *Elliotte*[2] and *Tunstall*[3] decisions (although it may not have used the precise language of those decisions) and ruled Carol's testimony admissible. While we shall never know for certain whether the appellant's right to cross-examine Carol was materially impaired by hypnosis inasmuch as he plead guilty before cross-examination could begin, the trial court's decision to admit Carol's testimony is unassailable in light of the fact that she related on direct examination essentially the same facts she had recalled prior to being hypnotized.

We agree that here the decision of the trial court to admit the testimony of Carol Rowland was unassailable.

■ The appellant also claims that the trial court erred in denying him a continuance on the morning that the trial commenced. The grounds were that the appellant had been ill, which prevented him from assisting counsel in preparation for trial. When the motion was made, however, counsel told the court, "I don't think that's a big problem because of his condition." Then counsel continued, "His witnesses are all here, and I feel that through spending an hour or so each day after court that we can

1. *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

2. *Elliotte v. State of Delaware*, 515 A.2d 677 (Del.1986).

3. *People v. Tunstall*, 63 N.Y.2d 1, 479 N.Y.S.2d 192, 468 N.E.2d 30 (N.Y.Ct.App.1984).

properly prepare for trial." In view of these comments of counsel, it is clear that the trial court did not abuse his discretion in denying the continuance.

Finally, the appellant, also on the day the trial was to commence, requested the trial court to appoint for him an expert in the field of post-traumatic stress syndrome to assist him in cross-examination of Dr. Bruce Snider. The trial court denied the motion. The appellant's brief does not explain why the expert, Dr. Paschal Baute, previously appointed by the court to assist the appellant, could not also assist in this area. The appellant also fails to show how such an appointment was "reasonably necessary," especially since there was no evidence elicited by the prosecution at trial concerning post-traumatic stress disorder. We perceive no abuse of discretion on the part of the trial judge in denying this motion.

For all the reasons set out above, the judgment of conviction and sentence of the Grant Circuit Court are affirmed.

LAMBERT, LEIBSON and WINTERSHEIMER, JJ., join this opinion by SPAIN, J.

STEPHENS, C.J., dissents by separate opinion in which REYNOLDS and STUMBO, JJ., join.

STEPHENS, Chief Justice, dissenting.

Respectfully I dissent.

The post-hypnotic statements of the witness, in my view, should be found *inadmissible per se*. The testimony in question inherently involves dangerous problems with reliability. These dangers include not only the possibility of suggestive statements potentially tainting the witness' recollections, but also the potential for confabulations on the part of the witness due to subconsciously rooted motives. For example, the witness may wish to present a more acceptable version of their own participation in the events in question. Under hypnosis, this subconscious motive may be unrecognizably influential to the person being hypnotized. *See People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354 (1982).

I recognize that the majority addresses these issues in its resolution of this case by examining the reliability of the statements in looking at both the witness' pre and post hypnotic statements. I cannot agree that this is enough to protect the person against whom this testimony is directed. An examination of this type does not alleviate other potential risks associated with hypnosis.

For example, it is often recognized that persons who have undergone hypnosis will begin to believe with more certainty the memories recalled under hypnosis. *See Shirley*, at 255–56, 723 P.2d at 1366. As a result, the witness will appear more believable at trial. Further, witnesses who have undergone hypnosis may confuse the memories prior to hypnosis with recall *or* fabrications that occurred during hypnosis. *Id.* When this confused witness takes the stand for a third reiteration of his or her testimony, there exists the possibility that a third version of events or testimony may result. The majority's treatment of hypnotic statements does nothing to address these potentially harmful effects.

As a result of the foregoing, I must dissent.

REYNOLDS and STUMBO, JJ., join this dissent.