Franklin ROARK, Jr., Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Nos. 2000–SC–0087–MR,
2000–SC–0088–MR.

Supreme Court of Kentucky.

Sept. 26, 2002.

Rehearing Denied Dec. 19, 2002.

David T. Eucker, Department of Public Advocacy, Frankfort, for Appellant.

A.B. Chandler, III, Attorney General, William L. Daniel, II, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for Appellee.

COOPER, Justice.

Appellant Franklin Roark, Jr., was convicted by a Campbell Circuit Court jury of burglary in the second degree, robbery in the first degree, and sexual abuse in the first degree. He was also found to be a persistent felony offender in the first degree and was sentenced to two concurrent enhanced sentences of life imprisonment.[1] He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

On November 29, 1997, the victim, N.T., was at home alone when she heard a noise that sounded like breaking glass. She later discovered that a basement window had been broken and that her bedroom had been ransacked. Money and numerous items of jewelry were missing from the bedroom, including a cross and chain that had been a gift from her sister on the occasion of N.T.'s fiftieth birthday. Also missing were photographs taken before and after N.T.'s recent surgery to remove her sternum, several ribs, and a portion of her lungs. The photographs, taken by N.T.'s surgeon for medical reasons, revealed N.T.'s unclothed chest.

On December 19, 1997, N.T. was again at home alone, clothed only in a robe and underwear, when she was attacked from behind by a male intruder. The intruder placed a knife against N.T.'s throat and told her to remain quiet. He then forced her to the floor and covered her head with his overcoat. N.T. lay still for a few minutes, then removed the overcoat from her face, intending to flee from the residence. However, the intruder was standing only a few feet away. She was able to observe the intruder for approximately five seconds before he exclaimed, "Now I am going to kill you," then attacked her and pulled her robe up over her head. As the two struggled on the floor, the intruder ordered N.T. to "[t]urn over, I want to see your operation," and forced her onto her back. He tied her hands in front of her body, cut off her underwear with the knife, and digitally penetrated her vagina and anus. Shortly thereafter, he left the residence and N.T. called the police. N.T. later discovered that the intruder had stolen money and a cameo broach from the same bedroom from which the November 29th burglar had also stolen money and jewelry.

The first police officer to arrive at N.T.'s residence on December 19th was Tom Lake. N.T. described the intruder to Officer Lake as a white male, 25 to 30 years old, five feet six inches to five feet seven inches tall, weighing approximate 155 pounds, and having light-colored hair. She did not mention whether his hair was thick or thin and specifically could not recall whether he had any facial hair. Shortly thereafter, N.T. described her assailant to Campbell County Police Detective Robert Thomas as a white male, 18 to 25 years old, five feet five inches tall, weighing 150 pounds, with light-colored hair that was shorter in the front than in the back, and with a four-to-five day growth of facial hair. After being checked for injuries at a local hospital, N.T. was

---

1. A separate sentence was not entered for the conviction of sexual abuse in the first degree which, upon PFO 1st enhancement, required a sentence of imprisonment for ten to twenty years. KRS 510.110(2); KRS 532.080(6)(b).

transported to the police station where she unsuccessfully attempted to identify her assailant from several hundred mug shots. She then assisted in the creation of two computer-generated composite sketches. The computer program creates a composite based on input of general descriptions. For example, the program provides age-group choices of 15 to 25, 25 to 35, and 35 and older. N.T. chose the 15 to 25 age range for the first drawing. She also chose the "medium" height range of five feet nine inches to six feet tall. The second composite, created the same day, was described as very similar to the first, except that the hair line on the second composite was higher on the forehead than on the first. The first composite was introduced at trial and shows a full head of hair and no facial hair. The second composite was either lost or misplaced but the Commonwealth admits it also showed a full head of hair and no facial hair.

Several days after the December 19th incident, N.T. was shown two photo lineups, approximately 250 photos of employees of a nearby meat packing plant, ten high school yearbooks, and a photo lineup of known sexual offenders. She was unable to identify her assailant from any of these photographs.

One of the investigators told N.T. that if no additional leads were found, he might ask her to undergo hypnosis. In March 1998, N.T., on her own initiative and without further suggestion from the police, was hypnotized by Jill Brunner, a "certified hypnotherapist" and an acquaintance of N.T.'s husband. The hypnosis was conducted in the presence of N.T.'s husband and was audiotaped. During the hypnosis, N.T. described her assailant in various ways, i.e., white male, between 25 and 30 years old, between 22 and 24 years old, 150 to 155 pounds, about 140 pounds, between five feet six inches and five feet eight

inches tall, and similar in appearance to one of her neighbors. She also described him for the first time as bald and having a full beard. N.T. delivered the audio recording of the hypnotism session to the police and examined another photo lineup but to no avail.

On October 28, 1998, Appellant's residence was searched by police in regard to an unrelated investigation. During the search, the police found the cross and chain that had been stolen from N.T.'s bedroom on November 29, 1997, and the cameo broach that had been stolen from the same bedroom on December 19, 1997. On November 10, 1998, N.T. was shown another photo lineup, including, for the first time, a photograph of Appellant. She immediately identified Appellant as the person who had assaulted and robbed her on December 19, 1997. She was also presented with audiotapes of different male voices speaking words that had been spoken to her by her assailant. She immediately identified Appellant's voice as that of the assailant and became so upset that the investigating officer had to stop the tape. N.T. requested a physical lineup but it was not provided. Instead, the police conducted a "showup," allowing N.T. to observe Appellant in jail clothes on a television monitor as he awaited his initial arraignment on these charges.

The trial judge overruled Appellant's pretrial motion to suppress N.T.'s photograph and voice identifications of him as the perpetrator, finding that the photo and audio lineups "were not unduly suggestive so as to violate the defendant's rights." The trial judge also found that the failure to provide a physical lineup and the fact that N.T. was subjected to hypnosis prior to her photo and voice identifications were simply part of the "totality of circumstances" to be considered in determining the validity of the identification. Ultimate-

ly, the trial judge concluded that there had been no "irreparable misidentification" and that any discrepancies in N.T.'s various identifications should go to the weight to be given to them by the jury.

At trial, N.T. described the person who attacked her on December 19, 1997, as a white male, between 25 and 30 years old, weighing approximately 155 pounds, and being five feet six inches to five feet seven inches tall. She also made an in-court identification of Appellant as being that person. Appellant is a white male, 43 years old, five feet five inches tall, weighing 160 pounds, with light hair, and balding. An acquaintance of Appellant testified that Appellant had a full beard during November and December 1997.

### I. JOINDER.

■ The grand jury rendered separate indictments for the November 29, 1997, and December 19, 1997, incidents. Appellant asserts error in the subsequent consolidation of those indictments for the purpose of trial. RCr 9.12. Whether to grant joinder is within the sound discretion of the trial judge and is reviewed for abuse of discretion. *Jackson v. Commonwealth*, Ky., 20 S.W.3d 906, 908 (2000). The issue is whether Appellant was unduly prejudiced by the joinder, *i.e.*, whether the prejudice was unnecessary and unreasonable. RCr 9.16; *Price v. Commonwealth*, Ky., 31 S.W.3d 885, 888 (2000) (*citing Romans v. Commonwealth*, Ky., 547 S.W.2d 128, 131 (1977)). The primary test for determining whether joinder constitutes undue prejudice is whether evidence necessary to prove each offense would have been admissible in a separate trial of the other. *Price*, at 889; *Rearick v. Commonwealth*, Ky., 858 S.W.2d 185, 187 (1993). Here, evidence necessary to prove each offense was admissible to prove the identity of Appellant as the perpetrator of the other.

KRE 404(b)(1). The perpetrator of the November 29th offense stole photographs showing a surgical scar on N.T.'s chest, and the perpetrator of the December 29th offenses indicated prior knowledge of the scar when he ordered N.T. to turn over on her back so he could see her "operation." Each incident involved the theft of money and jewelry from N.T.'s bedroom. And, of course, Appellant was found in possession of items stolen during the course of both incidents. Thus, Appellant was not unduly prejudiced by the joinder of the indictments for purpose of trial.

### II. EYEWITNESS IDENTIFICATION.

■ Disregarding momentarily the fact of N.T.'s intervening hypnosis, we find no Due Process violation in the admission of N.T.'s identification of Appellant as the person who robbed and sexually abused her on December 19, 1997. Our opinions on this subject have consistently followed the United States Supreme Court's decision in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See Savage v. Commonwealth*, Ky., 920 S.W.2d 512, 513 (1996); *Edmonds v. Commonwealth*, Ky., 906 S.W.2d 343, 345 (1995); *Sanders v. Commonwealth*, Ky., 844 S.W.2d 391, 393 (1993); *Riley v. Commonwealth*, Ky., 620 S.W.2d 316, 318 (1981); *Moore v. Commonwealth*, Ky., 569 S.W.2d 150, 153 (1978).

In *Neil v. Biggers*, the victim was attacked from behind by an intruder in her home who told her to "shut up or I'll kill you." The victim was then taken at knifepoint to a nearby wooded area and raped. The victim later described her assailant as "fat and flabby with smooth skin, bushy hair and a youthful voice," and "between 16 and 18 years old and between five feet ten inches and six feet tall, as weighing between 180 and 200 pounds, and as having a dark brown complexion." *Neil*, 409

U.S. at 194, 93 S.Ct. at 380. Over the next few months, the victim attempted without success to identify her assailant from various photographs, physical lineups, and showups. Seven months after the incident, she identified the defendant as her assailant after a showup in which two detectives walked him past the victim and directed him to speak the words "shut up or I'll kill you." *Id.* at 195, 93 S.Ct. at 380. The issue then became whether the show-up and voice identification procedure was so suggestive that the victim's identification violated the defendant's Due Process right.

Noting that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification,'" *Neil* held that unnecessary suggestiveness alone does not require exclusion of the identification. *Id.* at 198–99, 93 S.Ct. at 381–82. Instead, the inquiry is "whether, under the 'totality of the circumstances,' the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199, 93 S.Ct. at 382. The Court listed five factors to be considered in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. at 382. Weighing those factors, the Court found that "no substantial likelihood of misidentification" had occurred in that case. *Id.* at 201, 93 S.Ct. at 383.

N.T.'s identification of Appellant was made under substantially less suggestive circumstances than the identification of the defendant in *Neil.* Although N.T. also observed Appellant by way of a suggestive showup instead of a lineup, she had previously identified him by both appearance and voice during photo and audio lineups. N.T. had an opportunity, albeit brief, to view Appellant at the time of the crime and obviously did so with a substantial degree of attention. And although her earlier descriptions of her assailant varied in some respects and were inaccurate or incomplete in others, she demonstrated a high degree of certainty in identifying Appellant during the photo and audio lineups. In view of N.T.'s ongoing efforts to identify her assailant, we do not regard the passage of time between the incident and the identification as particularly significant. And an additional factor present here that was not present in *Neil* is that N.T.'s identification was corroborated by the fact that Appellant was found to be in possession of items stolen from N.T.'s bedroom on both November 29, 1997, and December 19, 1997. As did the Court in *Neil,* we conclude that, excluding consideration of the hypnotism issue, the totality of the circumstances indicates no substantial likelihood that N.T. misidentified Appellant as her assailant.

### III. HYPNOSIS.

Perhaps no issue in the law of evidence has been more hotly debated over the past twenty-five years than the admissibility of testimony by a witness who has been previously subjected to hypnotism. Surprisingly, this case represents our first major encounter with the issue. Our only previous decision on the subject, *Rowland v. Commonwealth,* Ky., 901 S.W.2d 871 (1995), turned not on the reliability of hypnotically induced, refreshed or enhanced recollection but on the fact that the witness's recollection of the crucial events in that case was essentially the same after her hypnosis as before. *Id.* at 873. Here, however, N.T.'s posthypnotic recollection of her assailant's appearance differed sub-

stantially from her prehypnotic recollection in that none of her previous descriptions included the facts that he was bald and had a full beard.

The "discovery" of hypnotism is generally credited to Franz Mesmer, an eighteenth century Austrian physicist, hence the term "mesmerize." 9 *Encyclopedia Britannica* 134 (5th ed. 1976). The American Medical Association has defined hypnosis as follows:

> [A] temporary condition of altered attention in the subject which may be induced by another person and in which a variety of phenomena may appear spontaneously or in response to [verbal] or other stimuli. These phenomena include alterations in consciousness and memory, increased susceptibility to suggestion, and the production in the subject of responses and ideas unfamiliar to him in his usual state of mind.

Council on Mental Health, *Medical Use of Hypnosis*, 168 J.A.M.A. 186, 187 (1958).

There is no scientific consensus as to how hypnotism works, probably because there is a sparsity of evidence and substantial disagreement as to how memory, itself, works. Those who believe that lost memory can be hypnotically recalled "conceptualize a process whereby the brain records and stores sensory input accurately, much like a videotape . . . and loss of memory is the inability to retrieve that information. Hypnosis simply enhances the retrieval process." *Borawick v. Shay*, 68 F.3d 597, 602 (2d Cir.1995) (citing, *inter alia*, Council on Scientific Affairs, *Scientific Status of Refreshing Recollection by the Use of Hypnosis*, 253 J.A.M.A. 1918, 1920 (1985)). Other scientists are highly skeptical that hypnosis can effectively and accurately enhance memory because they believe that "a memory is formed and influenced by numerous factors when the mind creates and integrates the information from an event 'into the memory representation of that event.' The composite created by this process is malleable and evolves over time as additional input is received." *Borawick*, 68 F.3d at 602–03 (citations omitted).

Three aspects of hypnosis have raised substantial doubts concerning the reliability of posthypnotic testimony: (1) During hypnosis, the subject is highly susceptible to suggestions made by the hypnotist and, in fact, one of the primary medical usages of hypnotism is to alleviate pain by the power of hypnotic suggestion. (2) During hypnosis, the subject rarely admits an inability to recall and will confabulate to fill in missing details in an effort to please the hypnotist. Typically, as with recollection implanted by suggestion, neither the subject nor the hypnotist is able to later distinguish between confabulation and true recollection. (3) After hypnosis, the subject becomes "memory hardened," *i.e.*, convinced that his/her "recollections" are accurate, an overconfidence that substantially impairs any possibility of effective cross-examination, Charles A. Wright and Victor J. Gold, 27 *Fed. Prac. & Proc. Evid.* § 6011, at notes 33–36, 60 (West 1990), Bernard Diamond,[2] *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif.L.Rev. 313, 333–40 (1980), thus implicating a criminal defendant's constitutional right of confrontation. *Contreras v. State*, 718 P.2d 129, 138–39 (Alaska 1986), *overruled on other grounds, State v. Coon*, 974 P.2d 386 (Alaska 1999).

Two scientific studies reported in the journal *Science* in 1983 heightened these concerns. The first, an hypnotic hy-

---

**2.** Then clinical professor of psychiatry at the University of California, San Francisco, and professor of law at the University of California, Berkeley.

permnesia experiment, tested the number of additional items of information recalled after hypnosis and the accuracy of those recollections. The scientists who conducted the study reported that, while hypnotized subjects recalled twice as many items as unhypnotized subjects, the hypnotized subjects made three times as many errors. Dywn & Bowers, *The Use of Hypnosis to Enhance Recall*, 222 *Science* 184, 184–85 (1983). Based on these results, the authors urged that the use of hypnosis be discouraged when the truth of information is the primary concern. *Id.* at 185. The second study tested whether a pseudomemory could be successfully implanted through hypnosis. Laurence & Perry, *Hypnotically Created Memory Among Highly Hypnotizable Subjects*, 222 *Science* 583 (1983). That study revealed that thirteen of twenty-seven subjects retained a belief suggested during hypnosis even after being informed after hypnosis that the information had been implanted by hypnotic suggestion. *Id.* at 524.

These and other concerns led the American Medical Association Council on Scientific Affairs committee, chaired by Dr. Martin Orne,[3] perhaps the foremost authority on the use of hypnosis in legal proceedings, to declare in December 1984 that "recollections under hypnosis are too shaky for the witness stand." Michael Beaudine, *Growing Disenchantment with Hypnotic Means of Refreshing Witness Recall*, 41 Vand.L.Rev. 379, 404 n. 220 (1988), (*quoting* Ritter, *Hypnotized Witnesses Spark Legal Dilemmas*, L.A. Times, February 10, 1985, § I, at 2, col. 6 (quoting the AMA committee)). "The committee found 'no evidence to indicate that there is an increase of only accurate memory during hypnosis [and that] there

is no way for either subject or hypnotist to distinguish between those recollections which may be accurate and those which may be pseudomemories.'" *Id.* "The same committee, in April 1985, similarly concluded that 'recall of past events, even ones that are traumatic, does not improve with hypnosis.'" *Id.* (citing *Use of Hypnosis to Aid Memory Faulted by AMA*, Wash. Post, April 5, 1985, at A5, col. 1). Compounding this evidence of scientific unreliability is the fact that jurors are apt to give more credence to hypnotically induced, refreshed or enhanced evidence because it is cloaked with the aura of scientific reliability and because of the "commonly held but erroneous belief" that an individual cannot lie under hypnosis. Wright and Gold, *supra,* § 6011, at note 62.

### 1. *Per Se* Admissible.

Early judicial decisions refused to admit any evidence purportedly induced, refreshed or enhanced by hypnosis. *E.g., People v. Ebanks,* 117 Cal. 652, 49 P. 1049, 1053 (1897) ("The law of the United States does not recognize hypnotism."), *overruled on other grounds, People v. Flannelly,* 128 Cal. 83, 60 P. 670 (1900). The first reported case approving the admission of such evidence at trial was *Harding v. State,* 5 Md.App. 230, 246 A.2d 302 (Md.1968). There, the recollection of a victim of a sexual assault was "refreshed" during hypnosis induced by a police-employed hypnotist. The defendant was already under arrest and the victim knew that the primary purpose of her hypnosis was to provide evidence against him. The victim subsequently insisted that she was testifying from her own independent recollection

**3.** Then director of the Unit for Experimental Psychiatry at the Institute of Pennsylvania Hospital and professor of psychiatry; president of the International Society of Hypnosis; editor of the International Journal of Clinical and Experimental Hypnosis; and senior author of the hypnosis article at 9 *Encyclopedia Britannica* 133–40 (5th ed.1976).

and the hypnotist denied that the victim's recollection had been tainted by any suggestions made by him during the hypnosis. The evidence was held *per se* admissible, *i.e.*, subject only to whatever weight and credibility a jury chose to give to it. *Id.* at 306. (One commentator subsequently posited that because the witness appeared so convincing and convinced of the accuracy of her testimony, the court was also convinced. Dilloff, *The Admissibility of Hypnotically Influenced Testimony*, 4 Ohio N.U.L.Rev. 1, 19, 20 (1977)). Most pre–1980 judicial decisions followed the *Harding* rule of *per se* admissibility.[4] However, in the face of growing scientific skepticism about the accuracy of hypnotically induced, refreshed or enhanced recollections, *Harding*, itself, was overruled by the same court that had produced it. *State v. Collins*, 296 Md. 670, 464 A.2d 1028 (1983). Only four state court jurisdictions presently follow the rule of *per se* admissibility.[5]

### 2. *Per Se* Inadmissible.

Most state jurisdictions currently adhere to a modified form of the *per se* inadmissible rule first adopted in *State v. Mack*, 292 N.W.2d 764 (Minn.1980). After examining the then-current scientific literature on the subject, *Mack* held that because hypnotically induced, refreshed or enhanced recollection was regarded as unreliable in the relevant scientific community, *i.e.*, psychology and psychiatry, it was inadmissible as evidence under the "scientific acceptance" test enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). "[T]estimony of this previously hypnotized witness *concerning the subject matter adduced* at the pretrial hypnotic interview may not be admitted in a criminal proceeding." *Mack*, 292 N.W.2d at 772 (emphasis added). Thus, *Mack* would permit the witness to testify to other matters, but not to the subject matter discussed during the hypnotism, including, presumably, prehypnotic recollections regarding the same subject matter. Even our decision in *Rowland v. Commonwealth*, *supra*, would not withstand the *Mack* analysis. In fact, we declined in *Rowland* to adopt a strict rule of inadmissibility. 901 S.W.2d at 873. Most states that follow *Mack* exclude evidence of facts only remembered after hypnosis but admit evidence of facts remembered *and related* before hypnosis. The burden is on the proponent of the evidence to prove that the recollection predated the hypnosis. *See, e.g., State v. Peoples*, *supra* note 4, at 188; *Contreras v. State*, *supra*, 718 P.2d at 139. At present, twenty-six states adhere to some form of the *per se* inadmissible rule.[6]

---

4. *E.g., United States v. Awkard*, 597 F.2d 667 (9th Cir.1979); *United States v. Narciso*, 446 F.Supp. 252 (D.C.Mich.1977); *Clark v. State*, 379 So.2d 372 (Fla.Dist.Ct.App.1979); *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974); *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979), *overruled, People v. Zayas*, 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513 (1989); *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978), *overruled, State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984).

5. North Dakota: *State v. Brown*, 337 N.W.2d 138 (N.D.1983).

   Oregon: *State v. Jorgensen*, 8 Or.App. 1, 492 P.2d 312 (1971), *partially abrogated*, Or.Rev. Stat. § 136.675 (the entire hypnosis procedure must be recorded and a copy of the recording furnished to the adverse party).

   Tennessee: *State v. Glebock*, 616 S.W.2d 897 (Tenn.Crim.App.1981).

   Wyoming: *Haselhuhn v. State*, 727 P.2d 280 (Wyo.1986).

6. Alaska: *Contreras v. State, supra*.

   Arizona: *State ex. rel. Collins v. Superior Court of County of Maricopa*, 132 Ariz. 180, 644 P.2d 1266 (1982).

   California: *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354 (1982) (witness disqualified from testifying), *partially abrogated by*, Cal. Ev.Code § 795 (evidence of events recalled and related prior to hypnosis admissible subject to "procedural safeguards" discussed *infra* in text).

This apparent trend, however, must be viewed in light of two major post-*Mack* decisions by the United States Supreme Court. In *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), that Court held that the right of a defendant to testify in his/her own defense cannot be precluded even if the testimony has been induced, refreshed or enhanced by hypnosis—and suggested that the same might be true with respect to an "arbitrary" rule that precludes a criminal defendant from presenting the testimony of other witnesses in support of his/her defense. *Id.* at 55, 107 S.Ct. at 2711 (*citing Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). "This rule operates to the detriment of any defendant who undergoes hypnosis, without regard to the reasons for it, the circumstances under which it took place, or any independent verification [corroboration] of the information it produced." 483 U.S. at 56, 107 S.Ct. at 2711–12. Although the Court ultimately opted for no position with respect to the admissibility of testimony of a previously hypnotized witness other than the defendant, *id.* at 58 n. 15, 107 S.Ct. at 2712 n. 15, the same logic would seem to apply as well to the *per se* exclusion of the testimony of any witness, including the victim of the crime, *e.g.*, N.T.

Virtually every jurisdiction that has adopted the *per se* inadmissible rule has, like *Mack*, arrived at its ultimate conclusion by application of the *Frye* test. That test, however, was abrogated for Federal Courts under Federal Rule of Evidence (FRE) 702 and replaced by the more liberal *Daubert* test, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 586, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993), under which acceptance within the relevant scientific community is only one factor to be considered in determining the

Connecticut: *Cf. State v. Atwood*, 39 Conn. Supp. 273, 479 A.2d 258 (1984) (applying rule to defendant's own testimony, thus, overruled to that extent by *Rock v. Arkansas*, discussed *infra* in the text).

Delaware: *State v. Davis*, 490 A.2d 601 (Del.Super.1985).

Florida: *Stokes v. State*, 548 So.2d 188 (Fla. 1989).

Georgia: *Cf. Walraven v. State*, 255 Ga. 276, 336 S.E.2d 798 (1985) (employing harmless error analysis).

Hawaii: *State v. Moreno*, 68 Haw. 233, 709 P.2d 103 (1985).

Illinois: *People v. Zayas*, 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513 (1989) (witness, except defendant, disqualified from testifying).

Indiana: *Peterson v. State*, 448 N.E.2d 673 (Ind.1983).

Iowa: *Cf. Odem v. State*, 483 N.W.2d 17 (Iowa Ct.App.1992) (posthypnosis testimony admissible because substantially similar to prehypnosis recollection).

Kansas: *State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (1985).

Maryland: *State v. Collins, supra.*

Massachusetts: *Commonwealth v. Kater*, 409 Mass. 433, 567 N.E.2d 885 (1991).

Michigan: *People v. Lee*, 434 Mich. 59, 450 N.W.2d 883 (1990).

Minnesota: *State v. Mack, supra.*

Missouri: *State v. Blackman*, 826 S.W.2d 76 (Mo.Ct.App.1992) (witness disqualified from testifying).

Nebraska: *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648 (1981).

New York: *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983).

North Carolina: *State v. Peoples, supra.*

Oklahoma: *Harmon v. State*, 700 P.2d 212 (Okla.Crim.1985).

Pennsylvania: *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981) (witness had no prehypnosis recollection); *Commonwealth v. Taylor*, 294 Pa.Super. 171, 439 A.2d 805 (1982) (prehypnosis recollection not excluded).

Utah: *State v. Tuttle*, 780 P.2d 1203 (Utah 1989).

Virginia: *Hall v. Commonwealth*, 12 Va. App. 198, 403 S.E.2d 362 (1991).

Washington: *State v. Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984).

West Virginia: *Cf. State v. Beard*, 194 W.Va. 740, 461 S.E.2d 486 (1995).

reliability of scientific evidence. Presumably, that same abrogation will be followed in those jurisdictions that have adopted an equivalent of FRE 702. *E.g., Mitchell v. Commonwealth*, Ky., 908 S.W.2d 100 (1995), *overruled on other grounds, Fugate v. Commonwealth*, Ky., 993 S.W.2d 931 (1999). Of course, that does not mean that a different result will be obtained but only that a different test will be applied. Note that both the *Frye* and *Daubert* tests are primarily tests of admissibility, *i.e.*, post-thypnosis evidence is admissible if post-hypnotic recollection is determined to be scientifically reliable. Another view, however, is that the issue is not so much one of scientific reliability as one of the *competency* of the witness to give accurate testimony. KRE 601(b)(2) and (4). Professors Wright and Gold espouse this view, *see generally* Wright and Gold, *supra*, § 6011, and three state courts, California,[7] Illinois [8] and Missouri [9] have held that the memory of a person subjected to hypnosis is so tainted thereby that he/she is incompetent to testify.

### 3. Procedural Safeguards.

A third approach with respect to the use of hypnotically induced, refreshed or enhanced recollection is that such evidence is admissible if certain safeguards were applied to the conduct of the hypnotism session. In *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981), it was held that posthypno-sis evidence is admissible if the following procedural safeguards were followed:

(1) The person conducting the hypnosis was a trained psychologist or psychiatrist;

(2) The professional conducting the session was independent of the parties;

(3) Information given to the hypnotist prior to the session was recorded;

(4) Before the hypnosis was induced, the hypnotist obtained a detailed description of the event from the subject;

(5) All contacts between the hypnotist and the subject were recorded;

(6) No one except the hypnotist and the subject were present during the hypnotism.

*Id.* at 95–97.

Six states currently follow the "procedural safeguards" rule of admissibility, five by judicial decision [10] and one by statute.[11] However, the validity of this rule was substantially undermined when Dr. Martin Orne,[12] the purported source of the "procedural safeguards" theory,[13] subsequently criticized *Hurd*, asserting that "while proposed safeguards can assist in determining what was done during the hypnotic session, they do not prevent witnesses from confusing distorted hypnotic memories with prior and subsequent nonhypnotic impressions or from placing undue confi-

---

**7.** *People v. Shirley, supra*, note 6, but see Cal. Ev.Code § 795, *supra*, note 6.

**8.** *People v. Zayas, supra* note 6.

**9.** *State v. Blackman, supra*, note 6.

**10.** Louisiana: *Cf. State v. Holden*, 554 So.2d 121 (La.App.1989) (applying the rule to a defendant's testimony, but see *Rock v. Arkansas, supra*.)

Mississippi: *House v. State*, 445 So.2d 815 (Miss.1984).

New Jersey: *State v. Hurd, supra*.

New Mexico: *State v. Beachum*, 97 N.M. 682, 643 P.2d 246 (Ct.App.1981).

South Dakota: *State v. Adams*, 418 N.W.2d 618 (S.D.1988), *abrogated on other grounds, State v. Hofer*, 512 N.W.2d 482 (S.D.1994).

**11.** Nev.Rev.Stat. 48.039.

**12.** *See* note 3, *supra*.

**13.** *State v. Hurd*, 432 A.2d at 96, citing Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int. J. Clinical & Experimental Hypnosis 311 (1979).

dence in distorted post-hypnotic recollections." Beaudine, *supra*, at 402–03, (citing Orne, Soskis, Dinges & Orne, *Hypnotically Induced Testimony*, in *Eyewitness Testimony: Psychological Perspectives* 171, 210 (G. Wells & E. Loftus eds. 1984)).

### 4. Totality of Circumstances.

A fourth theory that currently has support in nine state courts [14] and a growing number of federal courts [15] is a hybrid that neither automatically admits nor excludes posthypnosis evidence but determines admissibility on a case-by-case basis from the "totality of the circumstances." An illustrative list of those circumstances could include: (1) whether the purpose of the hypnosis was therapeutic or investigative, the latter tending to indicate pressure on the subject to remember; (2) whether procedural safeguards were employed with respect to the hypnotic session; (3) whether independent corroborating evidence exists to substantiate the witness's refreshed recollection; (4) whether, as in *Rowland v. Commonwealth, supra*, the witness's posthypnotic recollection was substantially the same as the witness's prehypnotic recollection as actually related; (5) the likelihood that the witness's memory has been tainted by outside influences (as in *Harding v. State, supra*, where the sexual assault victim identified after hypnosis the person who was already accused of assaulting her), or not (as in *United States v. Kimberlin, supra*, note 15, and *Beck v. Norris*, 801 F.2d 242 (6th Cir.1986), where the subject described matters unknown to the hypnotist); and (6) whether, under Evidence Rule 403, the probative value of the evidence is substantially outweighed by its prejudicial effect. Ordinarily, admissibility will be determined at an *in limine* hearing at which the proponent of the evidence must prove its reliability by a preponderance of the evidence. KRE 104(a). *See generally Borawick v. Shay, supra* note 15, at 608–09; *People v. Romero, supra* note 14, at 1016; *cf. State v. Hurd, supra*, at 97 (the same burden of proof applies to the "procedural safeguards" approach).

Professors Wright and Gold identify several problems with the "totality of circumstances" or, as they term it, "balancing" approach. For example, Rule 403 was designed to balance the relevancy of evidence against its prejudicial effect, not to balance various factors bearing on scientific reliability under Rule 702 or witness competency under Rule 601. Wright and Gold, *supra*, § 6011, at note 224. However, the Federal Rules of Evidence were drafted during the early period of the hypnosis debate and there is no indication that the drafters even considered the issue. *Id.* at

**14.** Alabama: *Chamblee v. State*, 527 So.2d 173 (Ala.Cr.App.1988).

Colorado: *People v. Romero*, 745 P.2d 1003 (Colo.1987).

Idaho: *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984).

Maine: *State v. Commeau*, 438 A.2d 454 (Me.1981).

New Hampshire: *State v. Hungerford*, 142 N.H. 110, 697 A.2d 916 (1997).

Ohio: *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988).

South Carolina: *State v. Cheeseboro*, 346 S.C. 526, 552 S.E.2d 300 (2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1310, 152 L.Ed.2d 219 (2002).

Texas: *Zani v. State*, 758 S.W.2d 233 (Tex. Cr.App.1988), *partially abrogated by* Tex. Rules of Crim. Ev. 702.

Wisconsin: *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386 (1983).

**15.** *Mersch v. City of Dallas*, 207 F.3d 732 (5th Cir.2000); *Borawick v. Shay*, 68 F.3d 597 (2d Cir.1995); *Bundy v. Dugger*, 850 F.2d 1402 (11th Cir.1988); *Harker v. Maryland*, 800 F.2d 437 (4th Cir.1986); *United States v. Kimberlin*, 805 F.2d 210 (7th Cir.1986); *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112 (8th Cir.1985).

notes 9, 224. The balancing approach is further hindered by the virtual impossibility of detection of suggestion or confabulation with any degree of certainty. *Id.* at note 226, citing Diamond, *supra,* at 337. Nevertheless, Wright and Gold note that "comparable risks and costs are associated with all testimony since suggestion and confabulation may be produced by the witness simply by discussing the case with her lawyer." *Id.* at note 228.

> [W]henever a court seeks to balance under Rule 403, the potential for unfair prejudice against probative value, it must estimate the reliability of the evidence and its likely effect on the jury's thinking. Such estimates are bound to be inexact. But Rule 403 implicitly assumes that the risk of uncertainty does not justify abandoning the effort to make such estimates. The same approach should be taken toward hypnotically refreshed testimony. In many cases, the indications concerning the reliability of such testimony or lack thereof will be clear. With respect to the hard cases, the issue becomes whether the effort to examine the circumstances and roughly estimate reliability is worth the necessary expenditure of resources. The tenor of the Federal Rules of Evidence, particularly Rule 601, indicates that it is.

*Id.* at notes 229, 230.

Nevertheless, Professors Wright and Gold also discern fewer flaws with this approach than with the other three approaches.

> While each of the three other approaches focus on important issues, they do so to the exclusion of other important considerations. For example, the per se competent approach is most concerned with the potential loss of valuable evidence and the effect a rule of incompetence might have on the investigatory use of hypnosis. But that approach could in some circumstances permit the admission of clearly unreliable testimony. On the other hand, the per se incompetent approach is preoccupied with the dangers of hypnosis. As a result, application of that approach could exclude valuable testimony which may be just as reliable as testimony from witnesses who have not undergone hypnosis. Finally, the Hurd approach unduly focuses on a limited number of procedural safeguards. Thus, testimony may be disallowed even where other circumstances suggest it is reliable and testimony may be permitted even where other circumstances suggest it is unreliable.

*Id.,* following note 223.

■■ We agree and conclude that the "totality of circumstances" approach is the soundest approach thus far developed for evaluating the admissibility of evidence that is the product of an hypnotically induced, refreshed or enhanced recollection. Applying that test to the facts of this case, at least three circumstances militate against the admission of N.T.'s posthypnotic identification and testimony. (1) The purpose of the hypnosis was investigative, not therapeutic, and N.T. was under substantial pressure, albeit primarily self-imposed, to identify her assailant. (2) N.T.'s posthypnotic recollection of her assailant's appearance was not substantially the same as her prehypnotic recollection. (3) No procedural safeguards were employed with respect to the conduct of the hypnotism, specifically, (a) the hypnotist was neither a psychologist nor a psychiatrist, but a "certified hypnotherapist" who admittedly was not qualified to perform a forensic hypnotism suitable for a criminal investigation; (b) the hypnotist was not independent, but was an acquaintance of N.T.'s family; (c) no information given to the hypnotist prior to the hypnotism was recorded; (d) the

hypnotist did not obtain a detailed description of the event from N.T. before conducting the hypnotism; (e) all contacts between the hypnotist and N.T. were not recorded; and (f) another person, N.T.'s husband, was present during the entire hypnotism.

At least two circumstances militate in favor of admission of N.T.'s posthypnotic identification and testimony. (1) There is little likelihood that N.T.'s memory was tainted by suggestion or confabulation. Appellant had not been identified as a suspect at the time the hypnotism took place; thus, the fact that he was bald and had a full beard was unknown to the hypnotist. (2) N.T.'s subsequent identification of Appellant as the perpetrator was corroborated by independent evidence that Appellant was in possession of property stolen from N.T.'s residence on the occasion of the assault. The first of these two circumstances diminishes the significance of the first and third circumstances militating against admission, *i.e.*, investigative purpose and no procedural safeguards; and the second of these two circumstances diminishes the significance of the second circumstance militating against admission, *i.e.*, differences between prehypnotic and posthypnotic recollections.

Thus, we conclude that the trial judge's admission of N.T.'s posthypnotic identification and testimony in this case was neither clearly erroneous, KRE 104(a), nor an abuse of discretion. KRE 403; *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999).

## IV.  ADMISSION OF AUDIOTAPE.

■ The audiotape of the hypnotism session was admitted into evidence during the testimony of Jill Brunner, the hypnotist. Appellant's complaint with respect to the admission of this evidence is not that the audiotape is inaccurate or inaudible or hearsay but that it was not properly authenticated by Brunner who admitted that she did not have time to review it in its entirety prior to trial. KRE 901(a). However, defense counsel's only objection at trial was that a transcript of the audiotape prepared by the Commonwealth contained numerous discrepancies (indicating that defense counsel had reviewed the audiotape in its entirety). It was agreed that the tape, itself, would be played and introduced into evidence in lieu of the flawed transcript. Having agreed to the admission of the audiotape, Appellant cannot now complain about its authenticity.

## V.  INSTRUCTION ISSUES.

### 1.  Missing evidence.

■ The police lost the second computer-generated composite sketch which, like the first, portrayed a man with a full head of hair and no beard. Further, the police did not retain the photo lineups shown to N.T. that did not include a photograph of Appellant. Instead, the photographs were reused in photo lineups in other investigations. Appellant asserts that the trial judge should have instructed the jury that it could infer from the fact that these items were now missing that they contained information favorable to the defense. *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 539–40 (1988). As we explained in *Estep v. Commonwealth*, Ky., 64 S.W.3d 805 (2002):

First, the purpose of a "missing evidence" instruction is to cure any Due Process violation attributable to the loss or destruction of exculpatory evidence by a less onerous remedy than dismissal or the suppression of relevant evidence.... Second, the Due Process Clause is implicated only when the failure to preserve or collect the missing evidence was intentional and the potentially exculpatory nature of the evidence

was apparent at the time it was lost or destroyed. None of the above precludes a defendant from exploring, commenting on, or arguing inferences from the Commonwealth's failure to collect or preserve any evidence. It just means that absent some degree of "bad faith," the defendant is not entitled to an instruction that the jury may draw an adverse inference from that failure.

*Id.* at 810.

Appellant does not suggest any bad faith in the loss of the composite or the failure to retain the lineup photographs. More importantly, he does not suggest how this evidence could have substantially affected the outcome of this case. The Commonwealth admitted that the second composite did not resemble Appellant and introduced the first composite which also did not resemble him. As for the photo lineups, if N.T. had identified a photograph of someone other than Appellant as that of her assailant, or if she had failed to identify Appellant's photograph as that of her assailant, either fact would have been exculpatory. However, N.T.'s failure to identify someone else as her assailant was not exculpatory. The trial court properly declined to include a "missing evidence" instruction in the jury instructions in this case.

### 2.  Lesser Included Offense.

■■■ Appellant asserts that the trial judge should have instructed the jury on receiving stolen property as a lesser included offense of robbery in the first degree. A lesser included offense is one that is established by proof of the same or less than all of the facts required to prove the primary offense. KRS 505.020(2)(a); *Commonwealth v. Day,* Ky., 983 S.W.2d 505, 509 (1999). Robbery is the use or threat of immediate use of physical force upon another in the course of committing a theft with the intent to accomplish the

theft. KRS 515.030(1). If the act is accompanied by an aggravating circumstance, KRS 515.020(1), the offense is robbery in the first degree. Thus, robbery combines the offenses of theft or attempted theft and assault. *Morgan v. Commonwealth,* Ky., 730 S.W.2d 935, 937 (1987). Receiving stolen property is not theft, *i.e.,* the act of stealing, but the act of receiving, retaining or disposing of property with knowledge that it has been stolen. KRS 514.110(1). Thus, while theft and attempted theft are lesser included offenses of robbery, receiving stolen property is not. *Jones v. Commonwealth,* Ky., 756 S.W.2d 462 (1988), which had seemingly held otherwise in the context of a claim of double jeopardy, was overruled specifically on that point in *Commonwealth v. Burge,* Ky., 947 S.W.2d 805, 811 (1996).

### VI.  SUFFICIENCY OF THE EVIDENCE.

■■■ Appellant asserts that he was entitled to a directed verdict of acquittal because N.T.'s varying descriptions of his appearance rendered her testimony contradictory, incredible and inherently unreliable. This is but a rerun of Appellant's earlier argument that the evidence of N.T.'s identification of him as her assailant should have been suppressed. It is elementary that even when the evidence is contradictory, the credibility of witnesses and the weight to be given to sworn testimony are for the jury to decide. *Young v. Commonwealth,* Ky., 50 S.W.3d 148, 165 (2001). Appellant's argument also conveniently ignores the fact that he was found to be in possession of the cross and chain stolen from N.T.'s residence on November 29, 1997, and the cameo broach stolen from her residence on December 19, 1997. The evidence was sufficient for reasonable jurors to fairly find beyond a reasonable doubt that Appellant committed each of

the offenses of which he was convicted. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991).

Accordingly, the judgment of conviction and sentences imposed by the Campbell Circuit Court are affirmed.

All concur.